ORIGINAL

1  CAULEY, GELLER, BOWMAN
      & COATES, LLP
2  BRIAN J. ROBBINS (190264)
   225 Broadway, Suite 1900
3  San Diego, CA  92101
   Telephone:  619/702-7350
4  619/702-7351 (fax)
        - and -
5  STEVEN E. CAULEY
   11311 Arcade Drive, Suite 200
6  Little Rock, AR  72212
   Telephone:  501/312-8500
7  501/312-8505 (fax)

8  Attorneys for Plaintiff

9

10                    UNITED STATES DISTRICT COURT

11                  CENTRAL DISTRICT OF CALIFORNIA

12                          SOUTHERN DIVISION

13  LYNDA L. STEINBECK, On Behalf of )  No. SACV  219 GLT  (ANx)
    Herself and All Others Similarly )
14  Situated,                        )  CLASS ACTION
                                     )
15                    Plaintiff,     )  COMPLAINT FOR VIOLATION OF THE
                                     )  FEDERAL SECURITIES LAWS
16       vs.                         )
                                     )
17  EMULEX CORPORATION, PAUL F.      )
    FOLINO, KIRK D. ROLLER, KAREN    )
18  MULVANEY, DON M. LYLE, ROBERT H. )
    GOON, MICHAEL J. ROCKENBACH,     )
19  MICHAEL E. SMITH and MICHAEL P.  )
    DOWNEY,                          )
20                                   )
                      Defendants.    )  DEMAND FOR JURY TRIAL
21  _____ )

22

23

24

25

26                                      ENTER ON ICMS

27                                      FEB 27 2001

28



02/20/01
SA   1-1 ENORA      Receipt # 035546
=====NO REFUND WITHOUT RECEIPT=====
         CIV EXPRESS
                                7:08:02 AM

CASE #   SA01219

086900    Filing Fee Civil      60.00
510000    Special Fund F/F       90.00

                                150.00
CHECK TENDERED $            $150.00
CHECK 5825

ORIGINAL

## NATURE OF THE CASE

1.   This is a securities class action on behalf of all purchasers of the common stock of Emulex Corporation ("Emulex" or the "Company") between 1/18/01 and 2/9/01 (the "Class Period"), against Emulex and certain of its officers and directors for violations of the Securities Exchange Act of 1934 (the "1934 Act").

2.   Emulex is a designer, developer and supplier of a line of Fibre Channel host adapters, hubs, ASICs and software products that provide connectivity solutions for Fibre Channel storage area networks ("SANs"), network attached storage ("NAS") and RAID.

3.   During the Class Period, defendants made positive but false statements about Emulex's results and business, while concealing material adverse information about customers pushing out orders.   As a result, Emulex's stock traded at artificially inflated levels, permitting defendants to sell $40.36 million worth of their Emulex stock.

4.   On 2/9/01, Emulex issued a press release directing people to visit the Company Website.   There, visitors were able to listen to a recording of its CEO describing what Emulex would disclose at a conference on 2/13/01: that it had been experiencing a push-out of orders since late January that might cause Emulex sales to fall short of previous Company guidance for Emulex's 3rdQ F01 to end on 4/1/01.   On Monday morning when the market opened again, Emulex's stock immediately crashed, falling 48% to $38-1/8 before closing at $40-3/8 on 2/12/01 on volume of 48.6 million shares.

- 1 -

**OVERVIEW**

5.   Emulex was a rapidly growing company during F01[1] with its stock price increasing from below $30 to above $70 by 10/00.[2]

6.   In 12/00, Emulex raised its guidance for F01 after it announced a major acquisition, the acquisition of Giganet, Inc. for 8 million shares.  On 1/18/01, Emulex reported 2ndQ F01 results in excess of this revised guidance and held a conference call for analysts and investors in which defendants boosted the Company's forecast for its results for the 3rdQ F01 to end 4/01/01.  As a result, Emulex's stock increased to above $109 by late 1/01.  Then, within a week, Emulex insiders sold 387,996 shares of Emulex stock for prices as high as $106 per share for total proceeds of $40.36 million.  These sales represented approximately 25% of their total available stock and option holdings.  At the time of these sales, Emulex was experiencing push-outs (or requests to delay the shipment of orders customers had previously submitted to Emulex) from certain of its customers (which included EMC, IBM and Compaq).  Thus, by the beginning of the Class Period, defendants actually knew that there was a strong likelihood that 3rdQ F01 results would not be as favorable as they had previously represented.

7.   It was not until 2/9/01, after defendants had completed their burst of insider selling that the Company began to reveal the push-outs.  These push-outs totaled approximately $9 million, representing more than 10% of the backlog and more than 10% of the expected 3rdQ F01 revenues Emulex had announced just three weeks

---

[1]   Emulex's fiscal year ends on the Sunday nearest June 30.

[2]   All share and per-share amounts are adjusted to reflect Emulex's 12/18/00 2-for-1 stock split.

earlier. Even then, Emulex did not disclose this information in a press release but merely invited people to visit the Company Website. There, those that visited learned of the order push-outs. Once the information reached the market, it devastated the Company's stock price.

8. On the disclosure, Emulex's stock price dropped to as low as $38-1/8 per share, a 48% decline from its close on 2/9/01, and a 64% decline from the Class Period high of $109-3/4 on 1/23/01.

9. As a result of the defendants' false statements, Emulex's stock price traded at inflated levels during the Class Period. Defendants took advantage of this inflated stock price, selling the following shares:

| Insider | Position | Shares Sold | Prices | Proceeds |
|---------|----------|-------------|--------|----------|
| Folino | CEO | 200,000 | $101.89-105.04 | $20.8 million |
| Roller | Sr. VP | 12,500 | $103.95 | $ 1.3 million |
| Downey | Director | 40,000 | $104.76-105.14 | $ 4.2 million |
| Lyle | Director | 60,000 | $103.23-105.41 | $ 6.2 million |
| Mulvaney | VP | 18,000 | $105.00-106.06 | $ 1.9 million |
| Smith | VP | 7,496 | $102.25 | $ 766,000 |
| Goon | Director | 50,000 | $100.75-104.93 | $ 5.2 million |
| TOTAL: | | 387,996 | | $40.36 million |

## JURISDICTION AND VENUE

10. Jurisdiction is conferred by §27 of the 1934 Act. The claims asserted herein arise under §§10(b) and 20(a) of the 1934 Act and Rule 10b-5.

11. Venue is proper in this District pursuant to §27 of the 1934 Act. Many of the false and misleading statements were made in or issued from this District.

1    12.   The Company's principal executive offices are in Costa

2  Mesa, California, where the day-to-day operations of the Company

3  are directed and managed.

4                              **THE PARTIES**

5    13.   Plaintiff Lynda L. Steinbeck purchased Emulex common

6  stock as described in the attached certification and was damaged

7  thereby.

8    14.   Defendant Emulex is a developer of storage products and

9  solutions.  Emulex's common stock trades in an efficient market on

10  the NASDAQ market system.

11    15.   (a)   Defendant Paul F. Folino ("Folino") was CEO,

12  President and a director of Emulex during the Class Period.  During

13  the Class Period, while in possession of material adverse

14  information about Emulex's business, Folino sold 200,000 shares of

15  Emulex stock for proceeds of $20.8 million.

16          (b)   Defendant Michael J. Rockenbach ("Rockenbach") was

17  CFO and Secretary of Emulex during the Class Period.

18          (c)   Defendant Kirk D. Roller ("Roller") was Senior Vice

19  President - Sales and Marketing of Emulex during the Class Period.

20  During the Class Period, while in possession of adverse information

21  about Emulex's business, Roller sold 12,500 shares of Emulex stock

22  for proceeds of $1.3 million.

23          (d)   Defendant Karen Mulvaney ("Mulvaney") was Vice

24  President - Business Planning and Development of Emulex during the

25  Class Period.   During the Class Period, while in possession of

26  adverse information about Emulex's business, Mulvaney sold 18,000

27  shares of Emulex stock for proceeds of $1.9 million.

28

- 4 -

1       (e)   Defendant Don M. Lyle ("Lyle") was a director of

2   Emulex during the Class Period.  During the Class Period, while in

3   possession of material adverse information about Emulex's business,

4   Lyle sold 60,000 shares of Emulex stock for proceeds of $6.2

5   million.

6       (f)   Defendant Robert H. Goon ("Goon") was a director of

7   Emulex during the Class Period.  During the Class Period, while in

8   possession of adverse information about Emulex's business, Goon

9   sold 50,000 shares of Emulex stock for proceeds of $5.2 million.

10       (g)   Defendant Michael E. Smith ("Smith") was Vice

11   President - Worldwide Marketing of Emulex during the Class Period.

12   During the Class Period, while in possession of adverse information

13   about Emulex's business, Smith sold 7,496 shares of Emulex stock

14   for proceeds of over $766,000.

15       (h)   Defendant Michael P. Downey ("Downey") was a

16   director of Emulex during the Class Period.   During the Class

17   Period, while in possession of adverse information about Emulex's

18   business, Downey sold 40,000 shares of Emulex stock for proceeds of

19   $4.2 million.

20      16.' The defendants named in ¶15(a)-(h) are collectively

21   referred to herein as the "Individual Defendants."

22           **SCIENTER, FRAUDULENT SCHEME AND COURSE OF BUSINESS**

23      17.  Emulex's top officers and directors, including the

24   Individual Defendants had knowledge of Emulex's problems with push-

25   outs and were motivated to conceal such problems.   The slowing

26   economy and potential slow-down in orders was the most important

27   factor facing Emulex in 2000. Thus, any push-out by customers was

28   a major concern to defendants and had the potential of causing a

1  shortfall in defendants' very favorable earnings projections to the

2  market. Emulex and the Individual Defendants are liable for making

3  false statements, including those by its executive officers.

4  Defendants' fraudulent scheme and course of business that operated

5  as a fraud or deceit on purchasers of Emulex stock was a success,

6  as it (i) temporarily deceived the investing public regarding

7  Emulex's prospects and business; (ii) artificially inflated the

8  prices of Emulex's common stock; (iii) caused plaintiff and other

9  members of the Class to purchase Emulex common stock at inflated

10  prices; and (iv) **permitted defendants to sell $40.36 million worth**

11  **of Emulex stock prior to the disclosure about order push-outs which**

12  **devastated Emulex's share price**.

13      18.  The shares sold were a significant portion of the

14  defendants' beneficial ownership as listed in the Company's

15  10/16/00 Proxy:

16

| Insider | Sold | Beneficial Ownership in Proxy | % Sold |
|---------|------|-------------------------------|--------|
| Folino | 200,000 | 1,011,804 | 19.8% |
| Roller | 12,500 | 37,500 | 33.3% |
| Downey | 40,000 | 202,000 | 19.8% |
| Lyle | 60,000 | 120,000 | 50% |
| Mulvaney | 18,000 | 21,000* | 85.7% |
| Smith | 7,496 | 51,994 | 14.4% |
| Goon | 50,000 | 80,000 | 62.5% |
|  | 387,996 | 1,524,298 | 25.5% |

25  * Mulvaney's ownership was not listed in the Proxy. Her beneficial

26  ownership is based on shares held.

27      19.  Thus, defendants sold a large percentage of their

28  holdings just days before disclosing information that devastated

- 6 -

1  the Company's share price, which is indicative of their knowledge

2  of the problems then afflicting Emulex's business.

3  **BACKGROUND TO THE CLASS PERIOD**

4  20.  Emulex is a designer, developer and supplier of a line of

5  Fibre Channel host adapters, hubs, ASICs and software products that

6  provide connectivity solutions for Fibre Channel storage areas.  In

7  12/00, Emulex announced it was acquiring Giganet for 8 million

8  shares and simultaneously raised its guidance for total F01 revenue

9  from $265+ million to $285 million and F02 revenue from $385+

10  million to $450 million.  The Company's stock price did appreciate

11  somewhat on this news to $89 but not much more as there were also

12  concerns about how the slowing economy would affect Emulex's

13  business.  Defendants sought to maintain and increase the stock

14  price so as to sell large amounts of Emulex stock and to attempt to

15  complete the acquisition of Giganet for fewer shares than would

16  otherwise be necessary.  Thus, they concealed the notifications of

17  order push-outs that they were receiving at the beginning of the

18  Class Period from their customers, including EMC, IBM and Compaq.

19  **FALSE AND MISLEADING STATEMENTS**

20  21.  On 1/18/01, Emulex issued a press release announcing its

21  2ndQ F01 results:

22  Emulex Corp., the world's largest supplier of Fibre

23  Channel adapters and a leader in storage networking,

24  Thursday announced results for its second fiscal quarter

25  ended Dec. 31, 2000.

26  Revenues expanded to a record $71.1 million, up 112%

27  from the $33.6 million reported for the same quarter a

28  year ago.  Net income for the second quarter of fiscal

2001 rose to a record $19.4 million, or $0.25 per diluted share, compared with net income of $8.8 million, or $0.11 per diluted share, for the same quarter a year ago.

\*        \*        \*

"In addition to the across-the-board sequential expansion in demand that we saw from our largest OEM customers, distribution revenue expanded by over 60% sequentially, as our newly launched ETIP and EARN reseller initiatives created new awareness and demand pull for the Emulex storage networking product family[, said Paul Folino].

"***As a result of growing demand, total Fibre Channel backlog also expanded by 36% sequentially to approximately $80 million at the end of the second fiscal quarter.***" In addition, Emulex continued to capture new Fibre Channel OEM business during the period, most recently announcing an agreement to provide LightPulse(R) ASIC target solutions to EMC for use in its flagship Symmetrix storage system.

On Dec. 7, 2000, Emulex announced the pending acquisition of Giganet Inc., a development-stage company specializing in IP storage networking solutions. "The response to this strategic move has been exceptionally positive, with OEMs, industry analysts and strategic partners recognizing the value of our planned support for both Fibre Channel and IP-based networked storage solutions," noted Folino.

1    "While we anticipate that Fibre Channel will

2    continue as the mainstay of storage networking for the

3    foreseeable future, emerging applications expected to be

4    served by IP storage promise to offer significant

5    incremental market opportunities for Emulex in coming

6    years."

7    22.   On 1/18/01, Emulex also announced a new agreement with

8  EMC.  The release stated:

9    Emulex Corp., the world's leading supplier of Fibre

10   Channel host adapters, Thursday announced it will supply

11   EMC Corp. with its Dragonfly chip, which is designed to

12   provide the target connection in Fibre Channel-enabled

13   storage systems.

14                    *       *       *

15   "By selecting our Dragonfly chip, EMC is better

16   positioned than ever to continue developing industry-

17   leading storage solutions," stated Kirk Roller, Chief

18   Operating Officer at Emulex Corp.  "The agreement marks

19   an important milestone in our relationship with EMC."

20   23.   Subsequent to issuing its results an new agreement with

21  EMC, Emulex hosted a conference call for analysts and investors on

22  1/18/01 at 2:30 p.m.  Pacific time.  Folino and Rockenbach hosted

23  the call in which they made statements and answered questions.

24  Their statements were made with the intent they would be repeated

25  to the market in analyst reports.  During the conference call

26  Folino and Rockenbach stated the following:

27   •    The backlog had grown 36% and then stood at $80 million.

28

- Although there had been a slowdown in the PC market, Emulex had not seen any impact on its orders or business and, in fact, was benefitting from increasing supplies of previously constrained components.

- The Giganet acquisition was set to close in the 3rdQ F01, ending 4/1/01 for 8 million shares and would expand Emulex's engineering staff to allow the Company to reach Emulex's goals for research and development, and the acquisition would be non-dilutive.

- Emulex had projected in 10/00 sequential revenue growth of 25% for the 2ndQ F01, had subsequently increased that to 28%-30% for the 2ndQ F01, and ultimately it had actually achieved 37% sequential growth to $71 million for 2ndQ F01. On an on-going basis Emulex expected to have 30% operating margins in Fibre Channel business.

- Emulex expected revenue to grow faster than the market, which was growing at 60% per year, and expected to grow 10%-12% per quarter. For the 3rdQ F01 Emulex expected to have revenue growth sequentially of 15%-17% with 11% sequential growth after that.

- Emulex expected its revenues to grow to $295 million for F01, up from previous forecasts of $285 million. For F02, Emulex expected revenues to increase, based on current conditions, to $475 million.

24. On 1/19/01, Credit Suisse First Boston issued a report on Emulex by Amit Chopra, which was based on and repeated information provided Chopra in the 1/18/01 conference call. The report forecast F01 and F02 EPS of $.87 and $1.10. It also stated:

1    Looking forward, we expect the company to continue

2    its momentum on all fronts.  In particular, we look for

3    the company's nascent Sbus and FICON HBA sales to

4    contribute incrementally to revenue over the next two

5    quarters.  Additionally, the design win announced today

6    with EMC could help segue into a broader relationship

7    with the storage leader.

8        We have raised our FY01 revenue and EPS estimates to

9    $295 million and $0.87.  We have also raised FY02 top and

10   bottom line estimates to $475 million and $1.10,

11   respectively.  We are elevating our price target to $130

12   and reiterate our Buy rating.

13                  *       *       *

14       Deepening OEM Relationships:  Management reiterated

15   its intention to extend and deepen its current OEM

16   agreements.  First, it announced a deign win earlier in

17   the day with EMC for its Dragonfly ASIC.  While the

18   product is currently in the developmental stages, this

19   could help Emulex segue into an expanded arrangement with

20   the storage king.  Additionally, its recent acquisition

21   of privately-held Giganet could yield relationships with

22   Network Appliance and Dell.

23                  *       *       *

24       In conclusion, we believe Emulex will continue to

25   benefit from the shift toward reliable storage networks

26   and the need for intelligent interconnects to manage the

27   flow of data.  ***With excellent short-term visibility from***

28   ***its OEM partners and growing strength in the reseller***

- 11 -

1    **market, we expect Emulex to continue to deliver**
2    **outstanding financial results in the coming quarters.** We
3    reiterate our Buy rating as Emulex remains a core holding
4    in the enterprise storage market.

5    25. On 1/19/01, USBancorp Piper issued a report on Emulex by
6    Ashok Kumar, which was based on and repeated information provided
7    Kumar in the 1/18/01 conference call. The report forecast F01 and
8    F02 EPS of $.85 and $1.10, a 25% three- to five-year EPS growth
9    rate and the following F01 revenue for Emulex:

10                          <u>F01</u>
11          Q3          $80M
12          Q4          $88.5M
13          Year        $295M

14   It also stated:

15          Emulex reported another strong quarter,
16   demonstrating its ability to manufacture and sell
17   technology to the network storage industry. Revenues
18   were up 29% Q/Q and 2x Y/Y to $71M. EPS of $0.25 also
19   more than doubled from the year ago period. FC business
20   expanded 37% Q/Q to $69M or 97% of mix. Among the
21   highlights were significant design wins with IBM and EMC.

22                    *        *        *

23          Emulex is very well-positioned to not only weather
24   the storms in the storage network industry, but also to
25   take advantage of the change to Ethernet and IP storage
26   as it occurs. **It is clear they have a grasp of the**
27   **market dynamics.** We believe all they need to do now is

28

1    to continue to execute as they have and they will be a

2    very successful company.

3        26.  On 1/19/01, A.G. Edwards issued a report on Emulex by

4    Shelby Seyrafi, which was based on and repeated information

5    provided Seyrafi in the 1/18/01 conference call.   The report

6    forecast F01 and F02 EPS of $.86 and $1.12.  It also stated:

7        *The company is not sensing the slowdown that many are*

8        *talking about and increased its guidance for F2001*

9        *revenue to $295 million (from $280-285M before) and*

10       *expects F2002 revenue to be around $475 million.*  We are

11       raising our F2001/2002 EPS estimates from $.74/$1.02 to

12       $.86/$1.12 and increasing our price objective to $125

13       (111x our F2002 EPS est.).  Given these positive results,

14       we are currently placing our rating and price objective

15       under review with an upward bias.

16                        *        *        *

17       *Orders/Backlog.   Visibility increased markedly as*

18       *backlog grew to $79.4 million, representing 46% of our*

19       *estimated next-six-months revenues (versus 39% in the*

20       *prior quarter and 26% two quarters ago).  Orders grew 18%*

21       *sequentially to $90 million.*

22                        *        *        *

23   CONCLUSION

24       Emulex is trading at around $108/share, 96x our

25   F2002 EPS estimate of $1.12.  This is in line with the

26   89% revenue growth that we are expecting for C2001.  We

27   believe that Emulex has many drivers - EMC should

28   continue to execute well (and the new Dragonfly deal

provides some upside here), Compaq should do well due to
strength in NT, IBM's Unix and mainframe businesses are
strong, FICON should be a driver (early 2001 due to tape,
mid-2001 due to IBM's Shark adding FICON capability), and
the secular trend toward storage networking.  Regarding
the latter, Emulex is well positioned both in Fibre
Channel SANs, NAS (through EMC with Celerra as well as
potential inroad into Network Appliance by leveraging the
Giganet transaction), and in Ethernet HBAs (through
Giganet) which will be useful as SCSI/IP takes off over
the coming years.  As previously mentioned, we are
currently placing our rating and price objective under
review with an upward bias.

27.  On 1/19/01, CE Unterberg, Towbin issued a report on
Emulex by James Poyner, which was based on and repeated information
provided Poyner in the 1/18/01 conference call.  The report
forecast F01 EPS of $.90 and stated:

> Guidance for the next period and fiscal 2002
> continued to climb, but the earnings pattern still
> suggests some flattening sequentially over the next two
> to three quarters.  Our estimates are increased from
> $0.74 in fiscal 2001 to $0.90 and from $1.00 in fiscal
> 2002 to $1.14.
>
> *     *     *
>
> Management's guidance has consistently proved
> conservative and its outlook for revenue of $295 million,
> up from $287 million before, for fiscal 2001 still looks
> conservative given Emulex's backlog.  For fiscal 2002,

1    the outlook is for revenue of at least $475 million,

2    including about $10 million from Giganet, growth of more

3    than 60%.   The idea is not to press expectations given

4    the current uncertainties in the domestic economy.   We

5    have settled on a $300 million forecast in fiscal 2001

6    and $474 million for fiscal 2002.

7    28.   On 1/19/01, Needham & Co., issued a report on Emulex by

8  Glenn Hanus, based on Hanus' conversations with defendants in the

9  1/18/01 conference call.   The report forecast F01 and F02 EPS of

10  $.85 and $1.10, respectively, and stated:

11       Consistent with the Company's recent announcement of

12       strong business momentum in its core fibre channel HBA

13       business and taking into account its recently announced

14       acquisition of Giganet, we are revising our estimates

15       upward.   Our estimates going forward are in line with the

16       Company's guidance to investors.   We note that our F2002

17       estimates appear quite conservative as they reflect

18       slower sequential growth in fibre channel and little

19       contribution from Giganet (about $10 million).   While

20       planning for a return to expected industry growth rates

21       in fibre channel related sales would appear prudent, we

22       have reason to believe that Giganet's business from NTAP

23       alone could be substantially more than included in our

24       forecast.

25       We are maintaining our fibre channel host bus

26       adapter growth rate for F3Q of roughly 16-17% sequential

27       growth, which raises our forecast in absolute dollars off

28       the higher base for F2Q.   Consequently, we are raising

1    our F2001 revenue forecast to $295 million up from $285

2    and EPS to $0.85 from $0.74.  For F2002 we are increasing

3    our  revenue  and  EPS  estimates  to  $475.4  million  and

4    $1.10, respectively.

5         29.  By 1/23/01, as a result of defendants' statements, Emulex

6    stock catapulted to above $109 per share.  Defendants then began

7    their  insider  trading  of  $40.36  million  worth  of  their  Emulex

8    stock.

9         30.  On  2/2/01,  Emulex  announced  "Support  for  Storage

10   Networking Industry":

11        Emulex Corp., the world's leading supplier of Fibre

12        Channel host bus adapters (HBAs), Friday announced its

13        support for the Storage Networking Industry Association's

14        (SNIA's) Technology Center Grand Opening in Colorado

15        Springs.

16                       *         *         *

17        "As the world's leading supplier of Fibre Channel

18        host bus adapters, Emulex fully recognizes the need for

19        a state-of-the-art facility specifically designed to

20        further the technological developments of networked

21        storage solutions," said Mike Smith, executive vice

22        president of Worldwide Storage at Emulex.

23        31.  On 2/5/01, Folino hosted a presentation at the Morgan

24   Keegan Area Networks Conference.  At this conference, defendants

25   did not disclose the order push-outs Emulex was experiencing and

26   Emulex's stock continued to trade at artificially inflated levels,

27   closing at $92-1/2 on 2/6/01.

28

1      32.  On 2/9/01, after the market closed, Emulex issued a press

2  release which stated:

3      WHAT:      Emulex   Corp.   will   present   to   investors

4                 attending   the   Goldman   Sachs   Technology

5                 Investment Symposium, Tuesday, Feb. 13, 2001,

6                 at  11  a.m.  PST.   President  and  CEO  Paul

7                 Folino, will host the presentation.   During

8                 this presentation and subsequent discussions

9                 with investors, the company expects to update

10                the  financial  and  other  information  that  it

11                outlined  in  its  quarterly  financial  results

12                conference  call  of  Jan.  18,  2001,  an  archive

13                of  which  may  be  accessed  via  a  webcast  at

14                h t t p : / / w w w . e m u l e x . c o m / c o r p /

15                investors/audio.html.  The presentation can be

16                heard  and  viewed  live  on  Tuesday,  Feb.  13,

17                2001,  at  11  a.m.  PST  on  the  Internet  via  a

18                webcast  at  https://www.gs.com/ir/conf/2  with

19                the  Username:   conference/conf2 and Password:

20                tech2001.   The  archived  version  of  Emulex's

21                presentation  will  be  available  on  Wednesday,

22                Feb.  14,  2001,  after  noon  PST  for  60  days

23                after the live presentation at the same link s

24                above.

25      WHEN:     Tuesday,  Feb.  13,  2001,  at  11  a.m.  Pacific

26                Standard Time

27      WHERE:    Live webcast at https://www.gs.com/ir/conf/2

28

33.  At the Website, visitors could listen to information that Emulex was experiencing order push-outs, which, if they continued, would result in lower 3rdQ F01 sales.  Few people knew about the information on the Website, but by Monday the information had reached the market.

34.  Accordingly, on Monday, 2/12/01, the Company's stock collapsed, dropping to as low as $38-1/8 before closing at $40-3/8 on volume of 48.6 million shares.  The price of $38-1/8 was 64% below Emulex's Class Period high of $109-3/4.

35.  Analysts described the situation at Emulex as follows:

• Needham & Co

Emulex will discuss at upcoming conferences that in late January and early February it experienced push outs to F4Q of some backlog that had been in place at the beginning of F3Q. **The push outs were spread across its customer base and involved multiple programs within each customer.**  Recall that Compaq, EMC and IBM are the Company's three largest customers and we suspect that the push-outs involved each of these companies.  Emulex typically enters a new quarter with 60-70% of the quarter in backlog.  F3Q was consistent with this trend. Although the Company has continued to see new orders in F3Q, some of the existing backlog in place at the beginning of F3Q was pushed out to 4Q.

Outlook

The Company is not changing its guidance at this time but if the trend from January were to continue throughout F3Q, our estimates would be at risk.

- 18 -

1   Visibility has recently declined based on these push-

2   outs.  Our estimate for F3Q is EPS of $0.23 on revenue of

3   $79.9 million.  A worst-case scenario could be EPS of

4   about $0.20 on revenue of about $72M.  Should this

5   downside scenario occur it would probably ripple forward

6   such that our F01 revenue and EPS estimates might decline

7   to $275 - $280M and $0.81, respectively and for F02 $420

8   - $430M and $1.00.

9   • A.G. Edwards

10      Late Friday (after the close), Emulex disclosed that

11   in mid-January it started seeing order deferrals from key

12   OEMs pushing out orders from its FQ3 (March 2001) quarter

13   into its FQ4 (June 2001) quarter.  (Emulex's largest OEMs

14   - EMC, IBM, and Compaq - accounted for roughly 56% of

15   revenue in the December 2000 quarter).  If the pattern of

16   order pushouts witnesses in January continues into the

17   following two months, then the company should experience

18   flat sequential revenue growth (versus our estimate of

19   13% sequential growth).

20   36.  As *The Wall Street Journal* reported on 2/13/01:

21      Wall Street was all but closed for the weekend

22   Friday evening when Emulex Corp. decided to push the

23   envelope.  Rather than send out a press release, the

24   company used the Internet to "Webcast" news that its

25   sales could slow.

26      In the process, the network-equipment maker in Costa

27   Mesa, Calif., may have sidestepped the Securities and

28   Exchange Commission's new rules on "fair disclosure."

1    Although the SEC encourages companies to use the Web to

2    enhance the flow of material news, its guidelines suggest

3    that companies "first issue a press release, distributed

4    through regular channels."

5        Emulex denies breaking any rules.   But company

6    officials were contrite after watching Emulex shares

7    plunge 48% Monday and hearing complaints from Wall Street

8    analysts and investors who say they were left in the

9    dark.

10        Mark Kelleher, an analyst with FAC Equities in

11   Boston, says few people knew about the Webcast and what

12   it contained when regular trading started Monday.

13   "Investors woke up Monday morning, and all they knew was

14   that Emulex was down," says Mr. Kellerher, referring to

15   a steep drop in premarket trading.

16                    *        *        *

17        Still, the company maintains this news wasn't

18   important enough to warrant a press release.  "We weren't

19   lowering  earnings  guidance,"  says  Ms.  Mulvaney,

20   characterizing the news instead as a "change in tone."

21        Wall Street disagreed, driving Emulex's shares down

22   $37.50 to $40.8, at 4 p.m. on the Nasdaq Stock Market.

23        U.S. Bancorp Piper Jaffray analyst Ashok Kumar, who

24   caught Friday's Webcast, said the news warranted a

25   downgrade in his rating of Emulex stock to "neutral" from

26   "buy."  In a report on Monday, he said Emulex's deferrals

27   were more than a hiccup, and he noted disappointing

28   results from such rivals as Network Appliance Inc. and

1   QLogic Corp. as evidence that the storage industry may be

2   in the midst of a broad slowdown.

3       But whereas Mr. Kumar got the word about Friday's

4   Webcast, many analysts and investors didn't learn of the

5   Webcast until much later.

6       37.  As a result of the defendants' false statements, Emulex's

7   stock   traded   at   inflated   levels   during   the   Class   Period.

8   Defendants took advantage of this inflated stock price, selling a

9   large portion of their available holdings for huge proceeds:

| Insider | Position | Shares Sold | Prices | Proceeds | % Sold |
|---------|----------|-------------|--------|----------|--------|
| Folino | CEO | 200,000 | $101.89-105.04 | $20.8M | 19.8% |
| Roller | Sr. VP | 12,500 | $103.95 | $ 1.3M | 33.3% |
| Downey | Director | 40,000 | $104.76-105.14 | $ 4.2M | 19.8% |
| Lyle | Director | 60,000 | $103.23-105.41 | $ 6.2M | 50% |
| Mulvaney | VP | 18,000 | $105.00-106.06 | $ 1.9M | 85.7%* |
| Smith | VP | 7,496 | $102.25 | $766,000 | 14.4% |
| Goon | Director | 50,000 | $100.75-104.93 | $ 5.2M | 62.5% |
| TOTAL: | | 387,996 | | $40.36M | 25.5% |

\* Mulvanay's beneficial ownership was not listed in the 10/16/00
Proxy.  Her percentage sold is based on the actual number of shares
she owned.

## FIRST CLAIM FOR RELIEF

### For Violation of §10(b) of the 1934 Act
### and Rule 10b-5 Against All Defendants

38.  Plaintiff incorporates ¶¶1-37 by reference.

39.  During the Class Period, defendants disseminated or
approved the false statements specified above, which they knew or
recklessly disregarded were misleading in that they contained
misrepresentations and failed to disclose material facts necessary

1  in order to make the statements made, in light of the circumstances

2  under which they were made, not misleading.

3      40.   Defendants violated §10(b) of the 1934 Act and Rule 10b-5

4  in that they:

5          (a)   Employed devices, schemes, and artifices to defraud;

6          (b)   Made untrue statements of material facts or omitted

7  to state material facts necessary in order to make the statements

8  made, in light of the circumstances under which they were made, not

9  misleading; or

10         (c)   Engaged in acts, practices, and a course of business

11  that operated as a fraud or deceit upon plaintiff and others

12  similarly situated in connection with their purchases of Emulex

13  common stock during the Class Period.

14     41.   Plaintiff and the Class have suffered damages in that, in

15  reliance on the integrity of the market, they paid artificially

16  inflated prices for Emulex common stock.   Plaintiff and the Class

17  would not have purchased Emulex common stock at the prices they

18  paid, or at all, if they had been aware that the market prices had

19  been artificially and falsely inflated by defendants' misleading

20  statements.

21     42.   As a direct and proximate result of these defendants'

22  wrongful conduct, plaintiff and the other members of the Class

23  suffered damages in connection with their purchases of Emulex

24  common stock during the Class Period.

25                    **SECOND CLAIM FOR RELIEF**

26          **For Violation of §20(a) of the 1934 Act Against**
            **Defendants Emulex, Folino and Rockenbach**
27

28     43.   Plaintiff incorporates ¶¶1-42 by reference.

44. Folino and Rockenbach acted as controlling persons of Emulex within the meaning of §20 of the 1934 Act. By virtue of their positions and their power to control public statements about Emulex, Folino and Rockenbach had the power and ability to control the actions of Emulex. Folino and Rockenbach controlled other employees of Emulex. Emulex controlled the Individual Defendants and the other officers of Emulex. By reason of such conduct, defendants Folino, Rockenbach and Emulex are liable pursuant to §20(a) of the 1934 Act.

## CLASS ACTION ALLEGATIONS

45. Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons who purchased Emulex common stock (the "Class") during the Class Period. Excluded from the Class are defendants, directors and officers of Emulex and their families and affiliates.

46. The members of the Class are so numerous that joinder of all members is impracticable. The disposition of their claims in a class action will provide substantial benefits to the parties and the Court. Emulex had more than 35 million shares of stock outstanding, owned by thousands of persons.

47. There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members include:

(a) Whether the 1934 Act was violated by defendants;

(b) Whether defendants omitted and/or misrepresented material facts;

1    (c)   Whether defendants' statements omitted material

2    facts necessary in order to make the statements made, in light of

3    the circumstances under which they were made, not misleading;

4    (d)   Whether defendants knew or recklessly disregarded

5    that their statements were false and misleading;

6    (e)   Whether the price of Emulex's common stock was

7    artificially inflated; and

8    (f)   The extent of damage sustained by Class members and

9    the appropriate measure of damages.

10   48.  Plaintiff's claims are typical of those of the Class

11   because plaintiff and the Class sustained damages from defendants'

12   wrongful conduct.

13   49.  Plaintiff will adequately protect the interests of the

14   Class and has retained counsel who are experienced in class action

15   securities litigation.  Plaintiff has no interests which conflict

16   with those of the Class.

17   50.  A class action is superior to other available methods for

18   the fair and efficient adjudication of this controversy.

19                          **PRAYER FOR RELIEF**

20   WHEREFORE, plaintiff prays for judgment as follows:

21   A.   Declaring this action to be a proper class action

22   pursuant to Rule 23;

23   B.   Awarding plaintiff and the members of the Class damages,

24   interest and costs; and

25   C.   Awarding such equitable/injunctive or other relief as the

26   Court may deem just and proper.

27

28

**JURY DEMAND**

Plaintiff demands a trial by jury.

DATED:   February 16, 2001        CAULEY, GELLER, BOWMAN
                                        & COATES, LLP
                                  BRIAN J. ROBBINS


                                  *Brian J. Robbins*
                                  ───────────────────────
                                     BRIAN J. ROBBINS

                                  225 Broadway, Suite 1900
                                  San Diego, CA  92101
                                  Telephone:  619/702-7350
                                  619/702-7351 (fax)

                                  CAULEY, GELLER, BOWMAN
                                        & COATES, LLP
                                  STEVEN E. CAULEY
                                  11311 Arcade Drive, Suite 200
                                  Little Rock, AR  72212
                                  Telephone:  501/312-8500
                                  501/312-8505 (fax)

                                  Attorneys for Plaintiff

N:\CASES\Complnts\Emulex.cp3

## CERTIFICATION OF NAMED PLAINTIFF
## PURSUANT TO FEDERAL SECURITIES LAWS

LYNDA L. STEINBECK ("Plaintiff") declares:

1.     Plaintiff has reviewed a complaint and authorized its filing.

2.     Plaintiff did not acquire the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action or any other litigation under the federal securities laws.

3.     Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4.     Plaintiff has made the following transaction(s) during the Class Period in the securities that are the subject of this action:

Sales:

| Date Sold | Number of Shares Sold | Selling Price Per Share |
|---|---|---|
| 01/19/01 | 200 shares | $101.50 |

Acquisitions:

| Date Acquired | Number of Shares Acquired | Acquisition Price Per Share |
|---|---|---|
| 02/05/01 | 100 shares | $88.00 |

5.     During the three years prior to the date of this Certificate, Plaintiff has not sought to serve or served as a representative party for a class in an action filed under the federal securities laws except as detailed below:

*Steinbeck v. Sonic Innovations, Inc., et al.*, Case No. 2:00CV848-B (C.D. Utah)

6.     The Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost

1   wages) directly relating to the representation of the class as ordered or approved

2   by the court.

3        I declare under penalty of perjury that the foregoing is true and correct.

4   Executed this _16_ day of _Feb._ _____, 2001.

5

6                                    LYNDA L. STEINBECK

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28